[No. 24835. Department Two. August 29, 1934.]

JOHN W. SPARLING, *as Trustee in Bankruptcy, Appellant,* v. GENERAL DISCOUNT AND MORTGAGE CORPORATION *et al., Respondents.*[1]

[1] Reported in 35 P. (2d) 60.

*R. J. Meakim* (*Arthur Grunbaum,* of counsel), for appellant.

*Eggerman & Rosling,* for respondent.

BLAKE, J.—This is a controversy between investors in securities of two of the A. E. Pierce corporations. The amount involved is about fifty thousand dollars— the value of practically all of the assets remaining to the two companies of a total of $2,400,000 invested by the public in their securities. While the structure of the two companies was different from a legal standpoint, their purpose was the same; namely, to obtain money from the public. The enterprises were conceived, initiated and carried on by C. C. Pierce until his death in 1927. From then on, the companies were under the control of A. E. Pierce.

The Washington Loan & Securities Company (which we shall call the securities company) was organized in 1913. The stock was held by the Pierces. The company issued its bonds or debentures, which were ostensibly secured by mortgages on real estate. Prior to the collapse of the Pierce group in 1931, $1,750,000 of these bonds were in the hands of the investing public. The plaintiff in this action, trustee in bankruptcy of the securities company, testified that there was left only ten thousand dollars.

The General Discount & Mortgage Corporation (which we shall call the discount company) was organized in 1923. It was organized with ten thousand

shares of preferred stock, of the par value of ten dollars per share, and twenty thousand shares of common stock, of no par value. The common stock carried with it the control of the corporation; the preferred stock carrying voting rights only upon failure of the company to pay dividends for two years. The entire issue of common stock was subscribed by and issued to the securities company for five hundred dollars. Thus, the' legal control of the discount company was held by the securities company.

Both companies, however, were under the personal domination and control of the Pierces. The personnel of the boards of trustees of both companies was identical—or, at least, a majority of the members of the board of one company comprised a majority of the board of the other. The members of the boards of both companies were mere figureheads, taking no active part or interest in the management of the companies. For all practical purposes, the affairs of both companies were handled by the Pierces as their own private enterprises, with a callous indifference to the rights of the corporations and of the bondholders of the securities company and the preferred stockholders of the discount company.

In 1926, there was an increase in the capital stock of the discount company. There was issued an additional 39,900 shares of no par common, which was subscribed by and issued to the securities company for five hundred dollars. This was issued with an agreement that forty per cent of it should be returned to the treasury of the discount company to be reissued to purchasers of preferred stock as a bonus—four shares of common stock to ten shares of preferred. This agreement was never carried out, although, in fact, a bonus of common stock was issued to purchasers of preferred stock in that ratio. When the col-

lapse came in 1931, this procedure had resulted in the over-issuance of the discount company's common stock to the extent of 15,960 shares.

In 1926, there was also an increase authorized in the preferred stock of the discount company. In July, 1931, there were outstanding 55,478 shares of preferred stock for which the discount company had received $554,478. At that time, the net value of the assets of the discount company did not exceed fifty thousand dollars. Yet, all through the years, the discount company had paid a seven per cent annual dividend on its preferred stock. Dividends were paid quarterly, the last having been declared payable June 30, 1931.

It is quite apparent, we think, that at no time were there profits or earnings which justified the payment of dividends. As we read this record, we feel justified in saying that every dividend paid impaired the capital of the discount company. But it was important to the Pierces to maintain regularity of dividends for two reasons: First, because failing to do so would entitle the preferred shareholders to a voice in the management; and second, it was through the maintenance of dividends that they kept the investing public hungry for preferred stock. And the method worked up until the very last. As late as March, 1931, the month's sales of preferred stock amounted to $18,275. But the Pierces not only declared and paid dividends on the preferred stock of the discount company, but also maintained an annual dividend rate of seventy-five cents a share on common. As a holder of the common stock of the discount company, the securities company received, through the years, a total of $62,798.63 as dividends.

Now, as we have seen, there were no profits from which dividends could be legitimately paid on discount company stock. Through bookkeeping devices, appar-

ent earnings were shown to justify the declaration of dividends. As its name would indicate, the discount company was engaged in the business of buying commercial paper and accounts. For the most part, its activities seem to have been confined to the purchase of open accounts from merchants. These were presumably payable in thirty days. Purchased at a two per cent discount, the company was theoretically earning twenty-four per cent a year on its investments.

As such accounts were purchased, they were set up on the discount company's books as though the discount had been actually earned and paid. As a matter of fact, the company was taking tremendous losses on them all the while. The accounts were purchased apparently without investigation as to the financial standing or moral integrity of either the merchants or the customers whose accounts were purchased. Many of the accounts were spurious. No charge-offs were made for bad accounts. More than that, there was an utter indifference on the part of the Pierces as to whether the accounts were good or bad. They were concerned only in making a showing on the discount company's books sufficient to apparently justify the dividends.

Rarely, however, was there sufficient money on hand to cover the quarterly dividend requirements. In such instances, a sufficient amount was advanced to the discount company from the funds of the securities company. It appears to have been the Pierces' purpose to reimburse the securities company for such advances, with interest at the rate of ten per cent per annum, as and when the discount company had funds available for that purpose. It appears that, in the years 1929, 1930 and 1931, the securities company advanced to the discount company the sum of $196,856.30. During the same years, the discount company repaid the securities

company $163,615.70. On July 7, 1931, when the crisis came in the Pierces' enterprises, the books of both companies showed a balance due of $52,740.70 on account of such advances. It is apparent, therefore, that, of the $163,615.70 paid by the discount company to the securities company, $19,500.10 was on account of interest.

When the quarterly dividend became payable December 31, 1929, the securities company gave the discount company a check for $10,321.64. This was not charged to the account of the discount company on the books of either company. Again, in December, 1930, the securities company advanced the discount company $11,833.25, for which the latter company was not charged on the books of either company. Both checks appear on the books of the securities company as payment of expenses of the discount company. Apparently, they were paid on the theory that the securities company was obligated to pay the expenses of the discount company as an additional consideration of the common stock of the latter, which had been issued to the securities company. In any event, the advances represented by these two checks were in addition to the $52,740.70, above referred to, which appeared on the books of both companies.

July 7, 1931, a receiver was appointed for the discount company. A group of the preferred stockholders got together for the purpose of salvaging what remained of the assets of the discount company. To this end, they proposed to the trustees of the securities company that they would liquidate the current obligations of the discount company and pay the expenses of the receivership, if the securities company would surrender all the common stock of the discount company to a trustee for the benefit of the preferred stockholders of the latter company. This was done, at

an expense of three thousand dollars to the preferred stockholders. The securities company received nothing of value for the surrender of the common stock.

A receiver who was shortly thereafter appointed for the securities company instituted this action. Bankruptcy proceedings ensued, and John W. Sparling was elected trustee, and as such was substituted as party plaintiff. He seeks, first, under § 67 (e) of the Bankruptcy Act, to set aside the transfer of the common stock, on the ground that it was a voidable preference; second, to recover $52,740.70 appearing on the books of both companies as the balance due the securities company from the discount company for monies advanced by the former to the latter; third, to recover $22,154.89 on account of two checks issued by the securities company to the discount company to cover the latter's expenses for the years 1929 and 1930; fourth, to recover $29,183 on account of office expenses alleged to have been advanced by the securities company for the discount company during the years 1928 to 1931, inclusive. Judgment was entered dismissing the action and denying defendant relief on a counterclaim. Plaintiff appeals.

■ All transfers of property within four months of the filing of a petition in bankruptcy are not voidable preferences. A transfer made without consideration is, of course, presumptively voidable. *Murray v. Ray,* 251 Fed. 866, 248 U. S. 584, 39 S. Ct. 182. But the transfer of property having no value does not constitute an unlawful preference. *In re Hamilton Automobile Co.,* 209 Fed. 596. A transfer of property by the bankrupt does not constitute a voidable preference, unless it diminishes the bankrupt's estate. 2 Collier on Bankruptcy (13th ed.), p. 1276; *Continental & Com-*

*mercial Trust & Savings Bank v. Chicago Title & Trust Co.,* 229 U. S. 435, 33 S. Ct. 829.

While the transfer of the common stock was without consideration, no justifiable inference may be drawn that the transfer was made with the intent to hinder, delay or defraud creditors of the securities company. On the contrary, it is clear that no injury could result to either the securities company or its creditors by reason of the transfer of the stock. For the stock was without intrinsic or speculative value. As we have seen, on liquidation the assets of the discount company would not pay to exceed ten per cent to preferred stockholders. The securities company, as a holder of common stock, would have no right to participate in the distribution of the assets of the discount company until the preferred stockholders were paid in full. So, it is obvious that the estate of the securities company was in no way depleted by the transfer of the common stock.

■■ With respect to the money demands made by appellant in this action, we have this situation. Pierce, the individual, was using the two corporate legal entities solely for his own purposes, using the funds of both interchangeably to serve his own purposes. Now that a final balance must be struck between the two corporations as a result of the illegal use of the funds of each for the ostensible benefit of the other, neither can, in equity or good conscience, be permitted to profit at the expense of the other.

As we have seen, the securities company, as a holder of common stock of the discount company, received $62,798.63 in dividends. These dividends were paid in impairment of the capital of the discount company. They were illegal. *Jorguson v. Apex Gold Mines Co.,* 74 Wash. 243, 133 Pac. 465, 46 L. R. A. (N. S.) 637; *Austin v. Wright,* 156 Wash. 24, 286 Pac. 48. They

were authorized solely through the ownership by the securities company of the common stock of the discount company. Though paid under the guise of dividends, there is no practical or actual difference in the status of this $62,798.63 received by the securities company and the status of the monies advanced by it to the discount company. The securities company should not be permitted to retain that amount and at the same time be allowed to recover monies advanced by it to the discount company. And, since the securities company has had the use of this $62,798.63 without interest, we see no equity in allowing it interest on its advances to the discount company.

As we have seen, according to the books of both companies, the securities company advanced $196,856.30 to the discount company in 1929, 1930 and 1931. During those years, the discount company repaid $163,615.70. Leaving interest out of consideration, this left a balance due to the securities company of $33,240.60, instead of $52,740.70, as claimed by appellant. Adding to this balance the amount of the checks of $10,321.64 and $11,833.25, issued by the securities company to defray expenses of the discount company for the years 1929 and 1930, respectively, makes a total of $55,395.49. That is the amount of the balance owing by the discount company to the securities company on account of monies actually loaned by the latter to the former. Setting that up against the illegal dividends received by the securities company, we find the balance to be in favor of the discount company in the sum of $7,403.14.

But appellant claims an additional $29,183 on account of office expenses and salaries alleged to have been paid by the securities company for the discount company during the years 1928 to 1931, inclusive. The evidence in support of this claim goes no further than to show that the two companies occupied the same

offices; that some of the employees of the securities company also worked for the discount company; that the discount company paid the salaries of such employees, rent and incidental office expenses.

There is no basis in the evidence to make a segregation of such charges other than the arbitrary one for which appellant contends, namely, that they should be borne equally by both companies. This may be a feasible and reasonable basis as to the rent and incidental office expenses. As to salaries, however, there is no attempt to show how much time the common employees devoted to the work of each company. Any amount charged to the discount company on that account would be speculative and arbitrary. Allowing the securities company a credit for one-half the rent and office expenses, as claimed by appellant, would still leave a balance of $3,270.72 in favor of the discount company. It, however, did not appeal, and is seeking no relief in this court.

Judgment affirmed.

BEALS, C. J., TOLMAN, and HOLCOMB, JJ., concur.